## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**CORDERO RILEY,**

    **Plaintiff,**

**v.**

**(1) CLAYTON COUNTY, GEORGIA,**
**(2) JEFFREY TURNER,**
**(3) ALIEKA ANDERSON,**
**(4) GAIL HAMBRICK,**
**(5) FELICIA FRANKLIN,**
**(6) DEMONT DAVIS,**
**(7) CLAYTON COUNTY SHERIFF**
**LEVON ALLEN, in his official capacity,**
**(8) ROLAND BOEHRER,**
**(9) JONATHAN GREEN,**
**(10) BRANDON CRISS,**
**(11) RONNAE TOLBERT,**
**(12) ANWAR FULLERTON,**
**(13) STOKES WILLIAMS,**
**(14) KEVIN ROPER,**
**(15) CORRECTHEALTH CLAYTON, LLC,**
**(16) CORRECTHEALTH, LLC,**
**(17) DR. CHARLES V. CLOPTON,**
**(18) NP APRIL CAMERON,**
**(19) NURSE MCNEIL,**
**(20) NURSE WILLIAMS,**
**(21) NURSE FORREST,**
**(22) LPN DONALD TANNER,**
**(23) LPN JACLYN SMITH,**
**(24) LPN KENDRAH HAMBRICK, and**
**(25)-(39) JOHN/JANE DOES 1-15,**

    Defendants.

**CIVIL ACTION NO.**

_____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

Page 1

COMES NOW Cordero Riley ("Plaintiff" or "Mr. Riley"), and hereby brings this civil action for damages against the above-named defendants, further stating as follows:

## NATURE OF ACTION

1.

This Action seeks to redress the harm caused to Plaintiff resulting from the acts and omissions of the above-named individuals and entities while Plaintiff was incarcerated at Clayton County Jail ("the Jail") in Jonesboro, Georgia.

## PARTIES, JURISDICTION, AND VENUE

2.

Mr. Riley is an individual and resident of the State of Georgia. At the time of the filing of this lawsuit, Mr. Riley is not incarcerated.

3.

Defendant Clayton County, Georgia ("Clayton County") is a legal entity capable of suing and being sued. Clayton County owns the Clayton County Jail and is responsible for making repairs to the Jail. Service of process on Clayton County may be perfected on Jeffrey Turner, Chairman of the Clayton County Board of Commissioners, at 112 Smith Street, Annex 1, Jonesboro, GA 30236.

4.

Defendant Jeffrey Turner ("Turner") is the Chairman of the Clayton County Board of Commissioners ("Board" or "Commission") and was the Chairman when the incident in question took place. Turner may be served personally at 112 Smith Street, Annex 1, Jonesboro, GA 30236.

5.

Defendant Alieka Anderson ("Anderson") was a Commissioner of Clayton County when the incident in question took place.

6.

Defendant Gail Hambrick ("G. Hambrick") was a Commissioner of Clayton County when the incident in question took place.

7.

Defendant Felicia Franklin ("Franklin") was a Commissioner of Clayton County when the incident in question took place.

8.

Defendant DeMont Davis ("Davis") was a Commissioner of Clayton County when the incident in question took place.

9.

Together, Clayton County, Turner, Anderson, G. Hambrick, Franklin, Davis, and possibly some unknown individuals currently identified by the moniker "John/Jane Does 1-15" who are or were County employees and who are responsible

(in whole or in part) for the incidents in question, make up the **"County Defendants."**

10.

Defendant Clayton County Sheriff Levon Allen ("Sheriff Allen" or "Allen") is being sued in his official capacity as head of the Office of the Clayton County Sheriff ("the Sheriff's Office"). (Allen was not sheriff when the incidents in question took place.) The Sheriff's Office operates the Jail, is responsible for notifying the County of the need for repairs at the Jail, is responsible for petitioning the County for funding to make repairs to the Jail, and is responsible for making repairs to the Jail from the Sheriff's Office's existing budget. Service of process on the Sheriff's Office may be perfected on Sheriff Allen at Harold R. Banke Justice Center, 9157 Tara Boulevard, Jonesboro, GA 30236.

11.

Defendant Roland Boehrer ("Boehrer") is being sued because he was the Interim Sheriff when the incidents in question took place.

12.

Defendant Jonathan Green ("Green") was a Major at the Sheriff's Office when the incidents in question took place.

13.

Defendant Brandon Criss ("Criss") was a Major at the Sheriff's Office when the incidents in question took place.

14.

Defendant Ronnae Tolbert ("Tolbert") was a Lieutenant at the Sheriff's Office when the incidents in question took place.

15.

Defendant Anwar Fullerton ("Fullerton") was either a sergeant or a corrections officer at the Jail when the incidents in question took place.

16.

Defendant Stokes Williams ("C.O. Williams") was a corrections officer at the Jail when the incidents in question took place.

17.

Defendant Kevin Roper ("Roper") was a corrections officer at the Jail when the incidents in question took place.

18.

Together, Sheriff Allen (in his official capacity), Boehrer, Green, Criss, Tolbert, Fullerton, C.O. Williams, Roper, and possibly some unknown individuals currently identified by the moniker "John/Jane Does 1-15" who are or were Sheriff's Office employees and who are responsible (in whole or in part) for the incidents in question make up the **"Sheriff's Office Defendants."**

19.

Defendant CorrectHealth Clayton, LLC ("CorrectHealth Clayton") contracted with the County and/or the Sheriff to provide medical care to inmates at the Jail in 2022. The nurses who were supposed to provide care to Plaintiff in April of 2022 were either employees or contractors of CorrectHealth Clayton. Service on CorrectHealth Clayton may be perfected upon its registered agent, CT Corporation System, at 106 Colony Park Drive, Ste. 800-B, Cumming, GA 30040.

20.

Defendant CorrectHealth, LLC ("CorrectHealth") wholly owns and operates CorrectHealth Clayton and sets all policies and procedures for CorrectHealth Clayton and its employees and contractors. CorrectHealth Clayton is essentially an alter ego of CorrectHealth, and the nurses who were supposed to provide care to Plaintiff in April of 2022 were either joint employees or joint contractors of CorrectHealth. Service on CorrectHealth may be perfected upon its registered agent, CT Corporation System, at 106 Colony Park Drive, Ste. 800-B, Cumming, GA 30040.

21.

Defendant Dr. Charles V. Clopton ("Clopton") was the Medical Director at the Jail in 2022 and was either jointly employed by or jointly contracted with CorrectHealth Clayton and CorrectHealth. As Jail Medical Director, it was

Clopton's job to supervise, train, and monitor the employees and contractors for CorrectHealth Clayton and CorrectHealth who were working at the Jail.

22.

Defendant NP April Cameron ("Cameron") was either an employee or a contractor of CorrectHealth Clayton and CorrectHealth who was supposed to provide medical care to Plaintiff in April of 2022.

23.

Defendant "Nurse McNeil" was either an employee or a contractor of CorrectHealth Clayton and CorrectHealth who was supposed to provide medical care to Plaintiff in April of 2022.

24.

Defendant "Nurse Williams" was either an employee or a contractor of CorrectHealth Clayton and CorrectHealth who was supposed to provide medical care to Plaintiff in April of 2022.

25.

Defendant "Nurse Forrest" was either an employee or a contractor of CorrectHealth Clayton and CorrectHealth who was supposed to provide medical care to Plaintiff in April of 2022.

26.

Defendant LPN Donald Tanner ("Tanner") was either an employee or a contractor of CorrectHealth Clayton and CorrectHealth who was supposed to provide medical care to Plaintiff in April of 2022.

27.

Defendant LPN Jaclyn Smith ("Smith") was either an employee or a contractor of CorrectHealth Clayton and CorrectHealth who was supposed to provide medical care to Plaintiff in April of 2022.

28.

Defendant LPN Kendrah Hambrick ("K. Hambrick") was either an employee or a contractor of CorrectHealth Clayton and CorrectHealth who was supposed to provide medical care to Plaintiff in April of 2022.

29.

Together, CorrectHealth Clayton, CorrectHealth, Clopton, Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, and possibly some unknown individuals currently identified by the moniker "John/Jane Does 1-15" who are or were CorrectHealth Clayton and CorrectHealth employees or contractors, and who are responsible (in whole or in part) for the incidents in question, make up the **"Medical Care Defendants."**

30.

All defendants are subject to the personal jurisdiction of this Court.

31.

This Court has subject matter jurisdiction over all claims brought in this Action pursuant to 28 U.S.C. §§ 1331 and 1367.

32.

Venue in this District is proper because the acts and omissions giving rise to the loss happened in Clayton County, which is within this District.

## ANTE LITEM NOTICE

33.

Plaintiff delivered an ante litem notice to Clayton and to the Sheriff's Office on April 8, 2023. See **Exhibit "1"** hereto.

## FACTS

### Three Sheriffs in Three Years

34.

In June of 2021, Georgia Governor Brian Kemp suspended then-Sheriff Victor Hill after he was indicted for civil rights violations by a federal grand jury. (He was eventually convicted and never regained his position.) Chief Deputy Roland Boehrer immediately became the Interim Sheriff by virtue of being the highest-ranking officer in the Sheriff's Office at the time. Boehrer remained Interim Sheriff until December of 2022, when he resigned and Levon Allen took over as Interim Sheriff.

In March of 2023, Allen became the duly elected Sheriff after winning a special election.

35.

Allen is Hill's godson and was endorsed by Hill.

**The Incidents Related to Mr. Riley's Injury**

36.

Mr. Riley was booked into the Jail on April 19, 2022 for a nonviolent offense.

37.

Mr. Riley was assigned to Housing Unit 7 ("HU 7"), Section 1. He was assigned either to Cell 113 or Cell 116 ("Mr. Riley's cell" or "his cell"). (Housing Units are also called "Pods.") HU 7 was a "max security" pod that housed violent offenders.

38.

Mr. Riley was first placed into his cell between around 9:30 pm and 10:00 pm on April 19th.

39.

Mr. Riley's cell did not lock. Further, there were not nearly enough staff to monitor and patrol the inmates in HU 7 properly. Also, there were 3 inmates in every cell, but only 2 beds in each cell.

40.

At around 10:30-10:45 pm that night, an inmate from another cell ("Assailant 1") walked into Mr. Riley's cell and demanded that Mr. Riley give Assailant 1 his Jail-issued flip flops. Mr. Riley declined.

41.

Assailant 1 then left Mr. Riley's cell. A short time later, Assailant 1 came back with about seven other inmates including himself.

42.

Assailant 1 and the seven other inmates severely beat Mr. Riley for about ten minutes.

43.

Mr. Riley's cell should have been locked so that an inmate from another cell could not enter, but the lock was not working.

44.

The Jail employees who worked in HU 7 knew that the lock on Mr. Riley's cell was not working.

45.

There is a control tower from which Jail employees could see the inmates in HU 7. Further, there were officers in the tower at the time Assailant 1 walked into Mr. Riley's cell the first time and the second time (with seven others). So, the

officers in the tower saw or should have seen Assailant 1 and the other inmates walk into Mr. Riley's cell.

46.

Mr. Riley lay in his cell for hours beaten and bloodied without medical attention.

47.

When the nighttime count was performed during either the late evening hours of April 19th or the early morning hours of April 20th, the corrections officer performing the count (who, on information and belief, was C.O. Williams) merely flashed his flashlight into the window of Mr. Riley's cell from a distance and did not go close enough to the cell to see Mr. Riley lying on the floor. Mr. Riley saw the officer flash his light into the cell, but he could not yell for help.

48.

At approximately 6:30 am on April 20th, while Defendant Roper was performing the morning count in HU 7 Section 1, he discovered Mr. Riley in his cell with his face and lips swollen. Roper and Defendant Fullerton escorted Mr. Riley to the Infirmary around 7:12 am.

49.

Mr. Riley was seen by Defendant Cameron and other female nurses in the Infirmary (who, on information and belief, were Nurse Williams, Nurse Forrest, and

Nurse McNeil). Roper and Fullerton were also present while Mr. Riley was being evaluated in the Infirmary. One or more of those individuals took photos of Mr. Riley in the Infirmary.

50.

Cameron noted that Mr. Riley was beaten in the face and ribs, that he had "7/10" pain in his "left ribs" for the past 9 hours, and that he had "pain with breathing" and facial swelling.

51.

Cameron noted that Mr. Riley needed x-rays of the left side of his face and his left ribcage, but neither she nor anyone else ordered those x-rays. Instead, Mr. Riley was given Motrin and ice in the Infirmary, after which he was "cleared" by Defendant Nurse McNeil and sent back to population after about 45 minutes in the Infirmary (he was reassigned to HU 1, Section 4, Cell 409). Mr. Riley was sent back to population even though he explicitly told Cameron, the other nurses, Roper, and Fullerton that he needed to go to the emergency room.

52.

Twice per day, a nurse would go through the housing unit during "pill call" and administer prescription medication to the inmates who had prescriptions.

53.

Cameron, Defendant Tanner, and Defendant Smith administered medications during the "pill calls" in HU 1 from April 20th (when Mr. Riley was sent back to population) to the evening of April 25, 2022 (when he was released).

54.

During each of these pill calls, Mr. Riley would tell the "pill call" nurse that he needed to go to the ER, that he was hurting, that he couldn't breathe, and that he needed more than Motrin. The pill call nurses would just say "We'll get with you" but wouldn't do anything else.

55.

After one such complaint during the evening "pill call" on April 22nd, the nurses did take Mr. Riley back to the Infirmary. By this point, Mr. Riley's breathing was more labored, and he explicitly told the nurses that he felt like he had a collapsed lung. He also told them that he got sharp pains from breathing and that he could not take deep breaths, that he could not sleep because of the pain and the difficulty breathing, and that he needed to go to the ER. The nurses listened to Mr. Riley's breathing with a stethoscope but made no comments. Then they gave him Motrin, let him ice for 15 minutes, and sent him back to his cell.

56.

Despite everything that Mr. Riley had told the nurses during that visit and despite what they had witnessed, Defendant K. Hambrick (one of the nurses who

evaluated Mr. Riley on the evening of April 22nd) falsely reported that Mr. Riley had no signs or symptoms of distress, that he stated his pain level was "5/10," and that he stated he "feels a lot better than a couple days ago."

57.

That was the last time Mr. Riley was taken to the Infirmary, despite the fact that he complained to the "pill call" nurses about his condition on April 23rd, 24th, and 25th.

58.

Mr. Riley also complained to every Jail employee that entered HU 1, Section 4 who would listen to him. Specifically, he told them that he needed to go to the ER because he could not breathe and felt like he had a collapsed lung. None of them made any effort to get Mr. Riley appropriate medical care.

59.

Mr. Riley was released from the Jail late in the evening on April 25th. When he got home, his breathing was so labored that he could not sleep.

60.

By the next morning, Mr. Riley's condition had worsened, so his parents took him to Piedmont Fayette Hospital's ER. He was admitted at 7:27 a.m. on April 26th.

61.

X-rays were taken of Mr. Riley at Piedmont. He was diagnosed with a left rib fracture, hydropneumothorax (fluid in the lungs and a collapsed lung), and a closed head injury.

62.

Mr. Riley's injuries were too severe for Piedmont Fayette to treat him, so he was transferred to Grady Hospital at 11:47 a.m. He was transported by ambulance with the "level of care" designated as "advanced life support."

63.

Mr. Riley remained hospitalized at Grady until April 30, 2022.

**Compromised Locks, Inmate Overcrowding, Understaffing Issues, and Medical Malfeasance Persist at the Jail**

64.

In September of 2022, the Board of Commissioners voted 3-2 to remove an agenda item to appropriate more than $2 million towards repairing the Jail's locks. One of the commissioners who opposed removing that item from the agenda explicitly stated that the locks issue was an "emergency." The next month, the Board appropriated $120,000 to replace some of the locks and hinges at the Jail, but this was not nearly enough money to repair all the Jail's inoperable locks.

65.

In September of 2023, Georgia Senator Jon Ossoff called on U.S. Attorney General Merrick Garland to open a federal investigation into the Jail because "[t]here

[were] credible reports and significant evidence[] that conditions in the jail [were] inhumane[ and] dangerous[] and put lives at risk." Senator Ossoff's letter specifically noted the situation involving an inmate named Alam Willison, who begged for medical help for nearly two months before dying of testicular cancer in January of 2023. Mr. Willison complained of being in excruciating pain, of not being able to sleep due to the pain, and of not being able to take a full breath due to the pain. Mr. Willison also asked to be taken to the emergency room constantly. In response, medical staff at the Jail simply gave him "Tylenol type medication," and told him after one complaint made a week before he died that they would "see him" in the Infirmary that night (although he told them he needed to go to the ER). See Ossoff Letter (attached as **Exhibit "2"**).

66.

Senator Ossoff's letter also cites several news articles detailing the deplorable conditions at the Jail in the months preceding the issuance of his letter. One of these articles—published in March of 2023 by The Appeal—describes corrections officers working 16-hour days due to understaffing. It also describes cell doors that do not lock, leading to inmates fearing being attacked in the middle of the night. "Georgia Jail Detainees Say Their Lives Are At Stake Ahead of Key Sheriff's Election"; https://theappeal.org/clayton-county-jail-sheriff-election/ (published on 03/13/23; last accessed on 04/11/24).

67.

In December of 2023, an inmate at the Jail was killed by his cellmate. Sheriff Allen blamed overcrowding.

68.

In January of 2024, Sheriff Allen told Atlanta News First that the Jail locks were "compromised" and that "[a]ll of the jail locks need to be replaced." Specifically, he noted that the current locks could easily be "popped" or "sheeted" by inmates, and that this created a security threat. He also told the Board of Commissioners, during a recent Board meeting, that Jail security was so bad (due to deteriorating facilities and understaffing) that cell phones and even guns could be smuggled into the Jail. "Clayton County sheriff addresses concerns over jail cell locks"; https://www.atlantanewsfirst.com/2024/01/17/clayton-county-sheriff-addresses-concerns-over-jail-cell-locks/ (published on 01/16/24; last accessed on 04/10/2024).

69.

In February of 2024, Sheriff Allen told WSB-TV that he has only received $3 million of the $20 million that he has asked the Board for to make necessary repairs to the Jail. Sheriff Allen said the Board's refusal to approve the remaining funds is because of "politics." Specifically, he accused the Board of "hold[ing] back the money just because [they didn't] like who's in place [because their] person didn't get selected [as Sheriff]." Sheriff Allen also stated that "I'm not attached to the previous administration; I'm a new person; I would like you to start me at 100 and take away if I do something." "Clayton County sheriff takes Channel 2 on tour of jail; blames county leaders for lack of funds." https://www.wsbtv.com/news/local/clayton-county/clayton-county-sheriff-takes-channel-2-tour-jail-blames-county-leaders-lack-funds/WKI3E6VG35DKDMUP6QJSCNDW5Y/ (published on 02/18/24; last accessed on 04/11/24).

70.

Also in February of 2024, Sheriff Allen told FOX 5 Atlanta that the Jail was "deteriorating, and he "credt[ed] many of the jail's problems during his 14-month tenure to years of neglected upgrades." He also noted that the Jail was vastly overcrowded (about 400 inmates over capacity) and needed to be expanded, and that it was grossly understaffed. Allen cited these as factors contributing to the beating death of inmate Johnathan Pettigrew by another cellmate in January of 2024, and

stated that "everything" he was asking for was for "the lives of the inmates or for the lives of the employees." The Board of Commissioners did not respond to FOX 5's request for comment related to Allen's statements. "Inside the Clayton County Jail: Sheriff Allen gives FOX 5 a tour of 'deteriorating' conditions"; https://www.fox5atlanta.com/news/clayton-county-jail-sheriff-allen-overcrowding (published on 02/17/24; last accessed on 04/11/24).

71.

However, when FOX 5 reported on Mr. Pettigrew's death in January of 2024, and Sheriff Allen indicated that overcrowding was a factor and called on the Board to provide funds for the temporary and permanent expansion of the Jail, Board Chairman Turner provided a written response to FOX 5 stating that the Board "has provided millions of dollars to fund all aspects of the sheriff's office." "Inmate, 27, dies after attack in overcrowded cell at Clayton County jail, officials say"; https://www.fox5atlanta.com/news/clayton-county-inmate-killed-in-jail-family-speaks (published on 01/06/24; last accessed on 04/12/24).

72.

In a Facebook post dated April 1, 2024, former Sheriff Hill accused Sheriff Allen of mismanaging Jail personnel and funds allocated by the Board, and asserted that this created a "dangerous environment at the jail which has led to 3 inmates being murdered while others are frequently stabbed or assaulted."

https://www.facebook.com/sheriff.hill/posts/a-message-from-retired-sheriff-victor-hillto-my-beloved-clayton-county-thank-you/7387113604698476/

https://m.facebook.com/story.php?story_fbid=pfbid0Kh957hCAgyWs4HBcC4FcU

HA95DkogXEsZY3QtJFS9CskFqiDA5422PEc12igtBkRl&id=100001997289386

(last accessed on 04/12/24).

73.

In response, Sheriff Allen issued a statement on Facebook the same day wherein he stated, inter alia, that "Former Sheriff Hill's desire for me to isolate myself from collaborating with community leaders and hinder progress in our county is rooted in his own strained relationships with those individuals." https://www.facebook.com/100064809003835/posts/from-the-desk-of-sheriff-levon-allendear-clayton-county-citizens-i-write-this-le/820133580156935/ https://m.facebook.com/story.php?id=100064809003835&story_fbid=8201335801 56935 (last accessed on 04/12/24).

74.

From April 2022 to the present, the security conditions at the Jail have not materially changed: the locks have been either inoperable or could easily be compromised, and the Jail has been vastly overcrowded and grossly understaffed. All these factors contributed to the dangerous security environment that Mr. Riley was confronted with during his incarceration at the Jail in April of 2022.

75.

Likewise, the same manner of medical negligence and deliberate indifference that Senator Ossoff described in his letter was endured by Mr. Riley in April of 2022.

## **LIABILITY**

### **Failure to Repair Jail Locks**
(As to the County Defendants)

76.

Plaintiff incorporates by reference Paragraphs 1-75 of this Complaint as if fully set forth and restated herein.

77.

The County Defendants knew, before the incident involving Mr. Riley, that many of the locks in the Jail were either completely broken/inoperable, or that they could be easily compromised and rendered inoperable by inmates through "popping" or "sheeting."

78.

The County Defendants also knew, before the incident involving Mr. Riley, that broken/inoperable locks, "popping," and "sheeting" drastically increased the risk of inmate-on-inmate violence to such a degree that repairing the locks was an "emergency."

79.

From April 2022 to the present, the County Defendants have only allocated $120,000 to repairing the Jail's locks and hinges, which was not nearly enough to repair all the inoperable locks. In fact, according to Sheriff Allen, all the Jail's locks were still "compromised" as of February 2024.

80.

By virtue of their refusal to allocate funds to repair the Jail locks and to make other necessary Jail repairs, the County Defendants created a policy, procedure, custom, or usage of allowing the Jail to fall into and remain in a state of dangerous disrepair. This policy, practice, custom, or usage dramatically increased the risk of inmate-on-inmate violence, thereby creating a security "emergency." Though subjectively aware of the fact that their policy, procedure, custom, or usage had created an "emergency" security situation, the County Defendants nonetheless refused to take prompt and sufficient action to fix the issue.

81.

The County Defendants' refusal to take prompt and sufficient action constitutes deliberate indifference in violation of the U.S. Constitution and the Georgia Constitution and subjects the County Defendants to liability under (inter alia) 42 U.S.C. § 1983.

82.

The County Defendants also breached their duties under State law and under County ordinance to provide a safe and secure Jail facility.

83.

The Board has willfully refused to fund necessary Jail repairs for years due to "politics." More specifically, the Board has withheld appropriate funding for necessary Jail repairs for years out of their disdain for former Sheriff Hill. These same Board members are still withholding funding for necessary repairs to the Jail "just because [they don't] like who's in place" and "[because their] person didn't get selected [as Sheriff]." That is, they are still withholding funding because Sheriff Allen—Hill's godson and his handpicked successor—won the special election and is now Sheriff, whereas the Board members' preferred candidate(s) lost. (Another example of the Board's disdain for former Sheriff Hill was the pay disparity between the Sheriff's Office employees and the Police Department employees: in 2022, the Clayton County Sheriff made more than $30,000 less than the Clayton County Chief of Police, and similar pay disparities existed across the board between the Clayton County Sheriff's Office and the Clayton County Police Department.)

84.

Thus, the Board's willful refusal to provide the funds necessary to repair the Jail locks prior to April 2022 (and beyond) emanated from a spirit of willfulness, wantonness, corruption, and/or malice, and/or was knowingly wrongful and not done

according to honest convictions in respect to duty. This means that the Board members are personally liable for the harm resulting from their failure to fund repairs to the Jail locks.

85.

As a direct and proximate result of the County Defendants' refusal to fund repairs to the Jail locks, Mr. Riley was viciously attacked and beaten on April 19, 2022.

**Failure to Repair Jail Locks and Correct Understaffing**
(As to the Sheriff, Boehrer, Green, Criss, and Tolbert)

86.

Plaintiff incorporates by reference Paragraphs 1-75 of this Complaint as if fully set forth and restated herein.

87.

In April 2022 and in the months and years leading up to April 2022, the Sheriff operated the Jail, was responsible for notifying the County of the need for repairs at the Jail, was responsible for petitioning the County for funding to make repairs to the Jail, and was responsible for making repairs to the Jail from the Sheriff's existing budget.

88.

Boehrer was acting Sheriff from June 2021 through December 2022. Green and Criss were Majors during this time, and Tolbert was a Lieutenant during this time.

89.

The Sheriff's Office, Boehrer, Green, Criss, and Tolbert knew, before the incident involving Mr. Riley, that many of the locks in the Jail were either completely broken/inoperable, or that they could be easily compromised and rendered inoperable by inmates through "popping" or "sheeting."

90.

The Sheriff's Office, Boehrer, Green, Criss, and Tolbert also knew, before the incident involving Mr. Riley, that broken/inoperable locks, "popping," and "sheeting" drastically increased the risk of inmate-on-inmate violence to such a degree that repairing the locks was an "emergency."

91.

Despite this knowledge, the Sheriff's Office, Boehrer, Green, Criss, and Tolbert did not allocate any portion of the Sheriff's Office budget to making repairs to the locks in or before April of 2022. Alternatively, the Sheriff's Office, Boehrer, Green, Criss, and Tolbert not notify the County that the locks at the Jail needed to be repaired, and did not petition the County for funding to make repairs to the locks in the Jail, in or before April of 2022.

92.

Similarly, the Sheriff's Office, Boehrer, Green, Criss, and Tolbert knew that the Jail was grossly understaffed in April of 2022. Despite this knowledge, these defendants did not allocate any portion of the Sheriff's Office budget to hiring more staff in or before April of 2022. Alternatively, these defendants did not notify the County that the Jail was grossly understaffed, and did not petition the County for funding to fix the understaffing problem, in or before April of 2022.

93.

By virtue of their refusal to repair the Jail locks (or alternatively, their failure to ask the County for funds to repair the locks) and to fix the staffing problem in or before April of 2022, these defendants created a policy, procedure, custom, or usage of allowing the Jail to fall into and remain in a state of dangerous disrepair and understaffing. This policy, practice, custom, or usage dramatically increased the risk of inmate-on-inmate violence, thereby creating a security "emergency." Though subjectively aware of the fact that their policy, procedure, custom, or usage had created an "emergency" security situation, these defendants nonetheless refused to take prompt and sufficient action to fix the issue.

94.

These defendants' refusal to take prompt and sufficient action constitutes deliberate indifference in violation of the U.S. Constitution and the Georgia Constitution and subjects them to liability under (inter alia) 42 U.S.C. § 1983.

### Failure to Train and Supervise/Monitor Jail Staff
(As to the Sheriff, Boehrer, Green, Criss, Tolbert, Fullerton, and John/Jane Does 1-15)

95.

Plaintiff incorporates by reference Paragraphs 1-75 of this Complaint as if fully set forth and restated herein.

96.

The Sheriff, Boehrer, Green, Criss, and Tolbert knew that the compromised Jail locks and understaffing created an "emergency" situation in April of 2022 and in the months leading up to April 2022.

97.

Due to the "emergency" security situation created by the compromised Jail locks and understaffing, it was incumbent upon Jail leadership to implement new policies and procedures to close the security gap, to diligently train Jail staff on those new policies and procedures, and to closely supervise and monitor Jail staff to ensure that those new policies were being followed.

98.

For example, when there are fewer staff members on the ground in the housing units, staff members must move from one housing unit to another more frequently to address issues. When locks are compromised, inmates can freely move from cell to cell. The confluence of these two serious problems means that policies providing for diligent camera and tower monitoring of inmates, clear and rapid communication between staff in the tower and/or monitoring surveillance cameras and staff members in the housing units, clear action plans to engage every conceivable issue, and the utmost diligence during inmate counts, are even more important.

99.

The Sheriff, Boehrer, Green, Criss, and Tolbert, along with others, would have been responsible for creating and implementing these new policies and procedures. However, they did not implement such new policies and procedures. Alternatively, assuming they did implement such new policies and procedures, they and other sergeants at the Jail (such as Fullerton) did not adequately train their subordinates (Corrections Officers, Security Specialists, etc.) in the new policies and procedures, and/or did not supervise and monitor their subordinates to ensure that they were correctly following the new policies and procedures.

100.

Specifically, in Mr. Riley's situation, the tower guards or the staff members monitoring surveillance footage should have immediately alerted Jail staff the *first*

time that Assailant 1 entered Mr. Riley's cell without authorization, and *definitely* should have alerted Jail staff the *second* time Assailant 1 entered Mr. Riley's cell with *seven other inmates*. Instead, *no one* was alerted *either time*, and Mr. Riley was beaten for *ten minutes* without a *single* member of Jail staff coming to render aid. This is ample evidence that adequate policies and procedures to rapidly address inmate-on-inmate violence either had not been implemented, or that there was a total lack of training and supervision by those in supervisory positions at the Jail to ensure that those policies were properly followed.

101.

Similarly, when the Corrections Officer performed the nighttime count in HU 7 after Mr. Riley was beaten, he did not see Mr. Riley lying on the floor beaten and bloodied because he did not get close enough to the cell, so Mr. Riely ended up lying there in agony for several more hours.  This is ample evidence that adequate policies and procedures to ensure that inmate counts were performed with the utmost diligence were never implemented, or alternatively, that there was a total lack of training and supervision by those in supervisory positions at the Jail to ensure that those policies were properly followed.

102.

The Sheriff, Boehrer, Green, Criss, Tolbert, Fullerton, and John/Jane Does 1-15 knew that it was substantially certain that the failure to implement necessary

policies and procedures related to inmate security, and/or to train and supervise their subordinates on how to properly follow them, would result in more inmates being assaulted, beaten, and killed. Despite this, they did not implement new policies and procedures related to inmate security, and/or they did not train and supervise their subordinates on how to properly follow those new procedures. This failure amounts to deliberate indifference under the U.S. Constitution and the Georgia Constitution and subjects these defendants to liability under (inter alia) 42 U.S.C. § 1983.

103.

As a direct and proximate result of these defendants' failure to implement new policies and procedures related to inmate security, and/or their failure to train and supervise their subordinates on how to properly follow those new procedures, Mr. Riley was harmed.

**Failure to Monitor Inmates**
(As to C.O. Williams and John/Jane Does 1-15)

104.

Plaintiff incorporates by reference Paragraphs 1-75 of this Complaint as if fully set forth and restated herein.

105.

Two officers were in the control tower both times Assailant 1 entered Mr. Riley's cell. They saw him enter both times and did nothing.

106.

These two officers' act of doing nothing amounts to deliberate indifference under the U.S. Constitution and the Georgia Constitution and subjects these defendants to liability under (inter alia) 42 U.S.C. § 1983.

107.

C.O. Williams violated his duty under State law and County ordinance to adequately and properly monitor the inmates at the Jail when he performed the inmate count in Mr. Riley's Section during the late evening hours of April 19th or the early morning hours of April 20th. C.O. Williams performed the count so poorly that he did not even recognize Mr. Riley lying in the cell beaten and bloodied. This resulted in Mr. Riley lying unattended for several more hours. C.O. Williams performed the count in this way from a spirit of willfulness, wantonness, corruption, and/or malice, and/or the act was knowingly wrongful and not done according to honest convictions in respect to duty.

## Deliberate Indifference to a Serious Medical Need
(As to Roper, Fullerton, Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, and John/Jane Does 1-15)

108.

Plaintiff incorporates by reference Paragraphs 1-75 of this Complaint as if fully set forth and restated herein.

109.

Roper, Fullerton, Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, and John/Jane Does 1-15 were subjectively aware that Mr. Riley suffered from a serious medical need.

110.

Despite their knowledge, these defendants did nothing more than provide Mr. Riley with Motrin and ice. This "care" was so cursory that it amounted to no care at all and constitutes deliberate indifference under the U.S. and Georgia constitutions, thereby subjecting these defendants to liability under 42 U.S.C. § 1983.

111.

These Defendants are also liable under State law for breach of their duty to provide Mr. Riley—who was a ward of the County under their care at the time— with adequate and appropriate medical care. These defendants' acts and omissions emanated from a spirit of willfulness, wantonness, corruption, and/or malice, and/or the acts and omissions were knowingly wrongful and not done according to honest convictions in respect to duty.

112.

As a direct and proximate result of these defendants' acts and omissions, Mr. Riley suffered harm.

## Medical Negligence and Breach of Fiduciary Duty
(As to Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, and John/Jane Does 1-15)

113.

Plaintiff incorporates by reference Paragraphs 1-75 of this Complaint as if fully set forth and restated herein.

114.

Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, and John/Jane Does 1-15 breached the duty of care that they owed to Mr. Riley by virtue of being medical professionals tasked with attending to his care by, inter alia, (1) not promptly sending him to the ER, (2) never ordering x-rays or other imaging, and (3) providing no treatment other than ice and Motrin.

115.

These defendants were negligent in the medical care delivered to Mr. Riley by failing to exercise that degree of care, skill, and diligence ordinarily employed by medical personnel generally under similar conditions and like surrounding circumstances.

116.

In addition, these defendants breached the fiduciary duty that they owed to Mr. Riley when they intentionally provided him with shockingly bad medical care. To make matters worse, they tried to cover it up by making blatantly false statements in the provider notes related to Mr. Riley's April 22, 2022 Infirmary visit.

117.

These defendants were acting incident to and within the course and scope of their employment or agency with CorrectHealth Clayton and CorrectHealth when they provided negligent medical care and breached their fiduciary duty to Mr. Riley. In particular, CorrectHealth has a policy of "cost containment" that these defendants were seeking to comply with. CorrectHealth's "cost containment" policy consists, inter alia, of (1) "work[ing] onsite" in order to "minimize[] inmate movement" and "lower costs," (2) "utiliz[ing] lower-cost healthcare providers," and (3) "choos[ing] and implement[ing] a cost-effective formulary of pre-approved list of lower-priced medicines and prescriptions." https://www.correcthealth.org/about-us/#ourcompany (last accessed on 04/12/24) (screenshot attached hereto as **Exhibit "3"**). It was these defendants' efforts to comply with this policy that directly resulted in Mr. Riley receiving shockingly bad care.

118.

As a direct and proximate result of the negligence and breach of fiduciary duty of these defendants, acting incident to and within the course and scope of their employment or agency with their respective employers, or the negligence of their respective employers acting through their employees or agents, or a combination of both, Plaintiff suffered bodily injury. As such, Plaintiff is entitled to recover for all damages suffered, including physical, emotional, and economic damages, both past and future.

119.

The affidavit of Dr. Robert D. Powers, MD—an expert witness who is competent to testify as to the standard of care required of these defendants—identifies at least one negligent act or omission and the factual basis for each such claim and is attached hereto as **Exhibit "4"**.

### Negligent Training and Supervision
(As to Clopton, CorrectHealth Cayton, and CorrectHealth)

120.

Plaintiff incorporates by reference Paragraphs 1-75 and 114-119 of this Complaint as if fully set forth and restated herein.

121.

As Medical Director of the Jail, Clopton was responsible for training and supervising Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, and John/Jane Does 1-15. Clopton failed to adequately train and supervise these defendants.

122.

As Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, and John/Jane Does 1-15's employers, CorrectHealth Clayton and CorrectHealth were responsible for training and supervising these defendants. CorrectHealth Clayton and CorrectHealth failed to adequately train and supervise these defendants.

123.

Mr. Riley suffered harm as a direct and proximate result of these acts and omissions.

## **Respondeat Superior**
(As to CorrectHealth Cayton and CorrectHealth)

124.

Plaintiff incorporates by reference Paragraphs 1-75, 114-119, and 121 of this Complaint as if fully set forth and restated herein.

125.

CorrectHealth Clayton and CorrectHealth are vicariously liable for the acts and omissions of Cameron, Nurse McNeil, Nurse Williams, Nurse Forrest, Tanner, Smith, K. Hambrick, John/Jane Does 1-15, and Clopton under the doctrine of respondeat superior.

## **DAMAGES**

126.

Plaintiff incorporates the foregoing Paragraphs of this Complaint as if fully set forth and restated herein.

127.

As a direct and proximate result of Defendants' individual and collective conduct, Plaintiff has suffered economic and noneconomic harm and is entitled to recover all available compensatory damages permitted by law.

128.

As a direct and proximate result of Defendants' individual and collective conduct, Plaintiff is entitled to recover from Defendants reasonable compensatory damages in an amount in excess of $10,000.00 to be determined by a fair and impartial jury for all damages Plaintiff suffered, including physical, emotional, and economic injuries.

## PUNITIVE DAMAGES

129.

Pursuant to O.C.G.A. § 51-12-5.1, to the extent a jury finds that the acts and omissions of some or all of the Defendants showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, then Plaintiff would be entitled to recover punitive damages from some or all of the Defendants in an amount to be determined by a fair and impartial jury.

130.

Some or all of the Defendants foresaw the harm that their acts and omissions would cause Plaintiff, and they intended the results that were foreseeable to them.

131.

What is foreseeable can be avoided. The refusal by some or all of the Defendants to avoid the foreseeable makes the conduct irrefutably intentional.

132.

For these reasons, Plaintiff is entitled to uncapped punitive damages against some or all of the Defendants.

133.

Plaintiff may further be entitled to punitive damages under Federal law to the extent a fair and impartial jury finds that some or all of the Defendants being sued under 42 U.S.C. § 1983 displayed malicious or reckless indifference to Plaintiff's constitutional rights.

## ATTORNEY'S FEES AND COSTS

134.

To the extent that a fair and impartial jury finds that some or all of the Defendants' actions evidence bad faith or stubborn litigiousness, or that they put Plaintiff through unnecessary trouble and expense, then Plaintiff would be entitled to recover his necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this Action, pursuant to O.C.G.A. § 13-6-11, as well as any other applicable statutory or common law basis.

135.

Further, Plaintiff may be able to recover his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 if a jury finds that his Federal

constitutional rights were violated.

## DEMAND FOR JURY TRIAL

136.

Plaintiff hereby demands a trial by jury as to all issues so triable.

**WHEREFORE, Plaintiffs demand a trial by jury and judgment against the Defendants as follows:**

a) Compensatory damages in an amount in excess of $10,000 to be determined by a fair and impartial jury;

b) All costs and litigation expenses of this action;

c) Reasonable attorneys' fees;

d) Punitive damages up to $250,000.00;

e) Uncapped punitive damages in excess of $250,000.00;

f) Nominal damages; and

g) Such other and further relief as the Court deems just and proper.

Date: April 15, 2024.

Respectfully submitted,

SMITH LAW, LLC

By:    */s/ William J. Smith*
       William J. Smith
       Georgia Bar No. 710280
       william@smithlaw-llc.com

3611 Braselton Highway, Suite 202
Dacula, GA 30019

T: (678) 889-5191 (Main)
T: (678) 889-2264 (William direct)
F: (844) 828-5615

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of April 2024, I have caused or will cause

personal service to issue upon the defendants to this Action with this COMPLAINT.

Respectfully submitted,

By:    */s/ William J. Smith*
William J. Smith
Georgia Bar No. 710280
*Attorney for Plaintiff*