# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Cordero Riley,

　　　　　　　　Plaintiff,

　　　　　　　　　　　　Case No. 1:24-cv-1567-MLB

v.

Clayton County, Georgia, et al.

　　　　　　　　Defendants.

_____/

## **<u>OPINION & ORDER</u>**

In April 2022, Plaintiff Cordero Riley spent six days in the Clayton County jail. Other inmates beat him severely, the medical staff provided minimal care, and he left the jail with a fractured rib and collapsed lung. Plaintiff sued several Clayton County officials and an outside contractor for violating his constitutional rights. (Dkt. 176.) Some Defendants move to dismiss. (Dkts. 187, 197, 198.) Plaintiff moves to add additional parties and claims and for judicial notice of certain facts. (Dkts. 196, 218.) The Court grants the motions to dismiss in part, denies the motion for judicial notice, and stays the motion to add parties.

## I.    Background

Plaintiff entered the jail on April 19, 2022 for violating probation. (Dkt. 176 ¶ 163.)  Jail staff placed him in Housing Unit 7, a "max security pod" for violent offenders.  (*Id.* ¶ 178.)  He was one of 189 inmates housed in the unit that night.  (*Id.* ¶ 189.)  Defendant Stokes Williams was the only officer in the unit's observation tower.  (*Id.* ¶¶ 191–92.)

Around 10:30 p.m., an inmate entered Riley's cell and demanded his flip-flops.  (*Id.* ¶¶ 196–97.)  Riley refused, and the inmate left but returned with several others.  (*Id.* ¶ 199.)  The group beat Riley for about ten minutes, knocked him unconscious, and moved him to another cell. (*Id.* ¶¶ 200, 215.)  Riley remained in that cell—"beaten, swollen, and bloodied"—until a guard found him early the next morning.  (*Id.* ¶¶ 238– 241.)

Guards took Riley to the jail infirmary.    (*Id.* ¶¶ 242–49.) CorrectHealth, a private medical care contractor, operated the infirmary and employed its nurses.  (*Id.* ¶¶ 50, 64–75.)  Despite Riley saying he needed to go to the emergency room, nurses treated him with Motrin and ice.  (*Id.* ¶¶ 255–59.)  Two days later, he sought more medical assistance, telling the nurses he was having difficulty breathing, thought he had a

collapsed lung and broken ribs, and wanted to go to the emergency room. (*Id.* ¶¶ 267–71.)  Again, they gave him only Motrin and ice.  (*Id.* ¶ 275.) Despite continuing to complain about his condition, the jail provided no further treatment.  (*Id.* ¶ 280.)  When the jail released him on April 25, Plaintiff went to a hospital and learned he had a broken rib, a collapsed lung, and hydropneumothorax (fluid in the lungs).  (*Id.* ¶¶ 290-293.)

Riley sued 39 Defendants (including 11 unnamed parties) under 42 U.S.C. § 1983 for violating his constitutional rights and Georgia state law.  (Dkt. 1.)  He filed an amended complaint, and the Court dismissed it as a shotgun pleading.  (Dkts. 102, 173.)  Riley then filed his second amended complaint, dropping eight Defendants and adding six others. (Dkt. 176.)  Relevant to this motion, Plaintiff claims his cell door should have been locked on the night he arrived at the jail, the inmates who beat him should have been locked in their cells, but the jail had an on-going— and well known—problem with broken or "rigged locks" that allowed inmates to leave their cells without permission, chronic understaffing, and rampant violence.  (*Id.* ¶ 201, 335-37, 342-43, 363, 394.)  He says the jail staff's failure to address those problems led to his assault.  (*Id.*)

Defendants Clayton County, Interim Sheriff Roland Boehrer (the Clayton County Sheriff at the time), Sheriff Levon Allen (the current the Sheriff), Major Brandon Criss (Commander of the Sheriff's Administrative Operations Division), and Officer Williams move to dismiss.[1] (Dkts. 187, 197, 198.)

## II. Standard of Review

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 667-78 (2009). A court may dismiss a pleading for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Iqbal, 556 U.S. at 678. At the stage of a motion to dismiss, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are

---

[1] A note to Plaintiff: Plaintiff's opposition briefs contain pages of single-spaced text in violation of Local Rule 5(C)(2). (*See, e.g.*, Dkt. 205 at 5–6; Dkt. 209 at 5–7; Dkt. 210 at 4–11.) Had his briefs been properly spaced, they would have exceeded the Court's page limitations. *See* Local Rule 7.1(D). The Court will strike his brief if he does this again.

construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

## III.  Plaintiff's Motion for Judicial Notice

Under Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of a fact "not subject to reasonable dispute" because it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). But the taking of judicial notice is "a highly limited process" because it "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). Thus "the kinds of things about which courts ordinarily take judicial notice are (1) scientific facts: for instance, when does the sun rise or set; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958." *Id.*

Six months after Defendants moved to dismiss—and almost four months after briefing ended—Plaintiff filed a Motion Requesting Judicial Notice of Certain Facts, asking the Court to take judicial notice of 56 facts

contained in a verified complaint Sheriff Allen filed against the Clayton County Board of Commissioners in September 2025.  (Dkt. 218.)  He includes facts about infrastructure problems at the jail (including failing locks), overcrowding and understaffing, poor medical services, and the Board of Commissioner's alleged awareness of those problems.  (*Id.*)

Despite Sheriff Allen having filed a "verified complaint," the allegations are unproven and disputed.  They certainly are not "generally known" or "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," as Federal Rule of Evidence 201 requires.  Moreover, the Court may only "take judicial notice of a document filed in another court [] for the limited purpose of establishing the existence of such litigation … and not for the truth of the matter asserted."  *O'Neal v. Allstate Indem. Ins. Co. Inc.*, 2021 WL 4852222, at *5 (11th Cir. Oct. 19, 2021);  *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) ("a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").  Yet Plaintiff asks the Court to take judicial notice of the truth of Sheriff Allen's allegations and use them to "draw the reasonable

inference that the [Defendants are] liable for the misconduct alleged." (Dkt. 218 at 12.)  The Court cannot do that.

The Court denies Plaintiff's motion for judicial notice.

## IV.    Interim Sheriff Boehrer and Major Criss's Motion to Dismiss

In Count 2, Plaintiff alleges Interim Sheriff Boehrer and Major Criss violated his Eight Amendment rights by being deliberately indifferent to the dangerous conditions of confinement at the jail that led to his injuries.[2]  (Dkt. 176 ¶¶ 387–415.)[3]  Sheriff Boehrer and Major Criss contend qualified immunity shields them from this claim.

"Qualified immunity offers complete protection for individual public officials performing discretionary functions insofar as their

---

[2] Plaintiff relies on the Eighth Amendment, but it is the Fourteenth Amendment that protects against mistreatment of arrestees or pretrial detainees in custody.  *See Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996).   His oversight, however, is of no consequence because the Court "may properly analyze [Plaintiff's] claim under the Eighth Amendment as certainly states may not impose on pretrial detainees conditions that would violate a convicted prisoner's Eighth Amendment rights." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995).

[3] In Counts 14 and 16, Plaintiff brought § 1983 and state law claims against Officers Anwar Fullerton and Kevin Roper.   They moved to dismiss those claims as part of the motion filed by Sheriff Boehrer, Major Criss, and Officer Williams.  Plaintiff voluntarily dismissed those claims in his response brief, removing them from this case.  (Dkt. 209 at n. 1.)

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012). The qualified immunity doctrine is generous—"it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The qualified immunity analysis begins with the threshold question of whether Sheriff Boehrer and Major Criss were "acting within [their] discretionary authority" during the events in question. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Plaintiff does not dispute claims by Sheriff Boehrer and Major Criss that they were acting within their discretionary authority in maintaining the jail. So, to avoid qualified immunity, Plaintiff must present evidence that these Defendants violated his statutory or constitutional rights and that it was "clearly established at the time" that their conduct did so.

### A.    Constitutional Violation

Restrictive, harsh, or unsafe prison conditions only "rise to the level of an Eighth Amendment violation [] when they involve the wanton and unnecessary infliction of pain." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). To assert an Eighth Amendment challenge to conditions

of confinement (or a Fourteenth Amendment challenge to conditions of pretrial confinement), a plaintiff must show the conditions "pose[d] an unreasonable risk of serious damage to his [or her] future health" or safety. *Id.* (quoting *Helling v. McKinney,* 509 U.S. 25, 33 (1993)); *Hale v. Tallapoosa Cnty.,* 50 F.3d 1579, 1582 n.4 (11th Cir. 1995) (courts consider conditions of confinement claims brought by pretrial detainees— protected by Fourteenth Amendment—under Eighth Amendment framework).    That requires a plaintiff to show the conditions are "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* Put differently, a plaintiff "must show that the risk of which he [or she] complains is not one that today's society chooses to tolerate." *Id.* This is called the "objective component" of an Eighth Amendment challenge to the conditions of confinement.

A plaintiff must also show the prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. *Chandler*, 379 F.3d at 1289. "The proper standard is that of deliberate indifference." *Id.* A prison official is deliberately indifferent to a dangerous condition of confinement when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must

9

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   The deliberate indifference standard requires more than simple or even gross negligence by the prison official. *Chandler*, 379 F.3d at 1289.   This is called the "subjective element" of an Eighth Amendment claim.

A prisons official who knows of a substantial risk to an inmate's health or safety can avoid liability for deliberate indifference by responding reasonably to abate that risk, even if his or her efforts fail. *Farmer,* 511 U.S. *Id.* at 844.   Finally, to succeed on an Eighth Amendment claim, a plaintiff must also show the prison official's deliberate indifference caused his or her injuries.   *Goodman v. Kimbrough,* 718 F.3d 1325, 1331 (11th Cir. 2013).

Plaintiff argues his complaint alleges a "confluence" of several dangerous conditions that satisfies the objective component of his Eighth Amendment claims.   This includes his allegations of "unlockable cells, makeshift weapons, inmate-on-inmate violence and extortion, the lack of a formal security plan, overcrowding, understaffing, poor officer training, and a poor (or poorly enforced) inmate classification system."   (Dkt. 209

at 15; Dkt. 176 ¶¶ 390–96.)    Sheriff Boehrer and Major Criss don't challenge Plaintiff's contention that these conditions created an unreasonable risk of serious damage to his health while incarcerated.  So the Court assumes they do and finds Plaintiff plausibly alleges the "objective component" of his claim.

Plaintiff also argues he has presented evidence to show Sheriff Boehrer and Major Criss knew of these dangerous conditions before his confinement in April 2022.  (Dkt, 176 ¶¶ 390–96.)  As part of this, he points to internal jail communications he attached to his complaint.  The documents include an August 2021 email from a correctional officer to the jail's "Command Staff," explaining "[officers in the jail] have low security awareness," "multiple doors in [a housing unit] aren't fixed [and] inmates are able to go in and out as they please and pop a door and attack someone," "weapons are constantly being found on inmates," "and "there still hasn't been a major shake down of the facility after multiple weapons and stabbing incidents."[4]  (Dkt. 176-4.)   The officer concludes the email

---

[4] Though Boehrer and Criss's names are not explicitly listed as recipients of the email, it is reasonable to infer they received the email—or at least notice of it—as two of the top officials on the "Command Staff" overseeing the facility.  *See St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th

by repeating that "multiple housing units have doors that are rigged and or broken allowing inmates to come and of out of cells as they please" and warning "the jail is not a safe place right now." (*Id.*)

He also includes an August 2021 email addressed to Sheriff Boehrer and Major Criss in which a jail official reported that a nurse feared for her safety while helping an inmate in Unit 1 because—after a guard left her in the unit—several inmates began "popping out of their cells."[5] (Dkt. 176-3 at 2.) In an email chain from October 2021 that Plaintiff also attached, Sheriff Boehrer recognized the danger and prevalence of inmates "popping out." In a discussion of the need for officers to close and lock doors, a correctional officer wrote that when he had gone into the housing units he "noticed a lot of inmates popping out of the cells" and that "this [is] starting to become a regular thing." (Dkt. 176-7 at 2.) Sheriff Boehner responded to all command staff—including Major

---

Cir. 2002) (In reviewing motion to dismiss, the Court must draw all reasonable inference in the plaintiff's favor). Boehrer and Criss also do not suggest they did not see the email.

[5] The Complaint explains that "popping" or "sheeting" is "when an inmate jams something into hinges or the locking mechanism of the cell door to prevent it from locking." (Dkt. 176 ¶ 99.)

Criss—that "[i]f any door is left open the potential for rigging and tampering is always a possibility … the popping occurs when cell doors are not being shut and inmates have rigged those cell door locks by jamming paper or other items into the locking mechanism.  That's why we must shut doors!"  (Dkt. 176-7 at 1.)  Sheriff Boehrer also attached a previous email he sent on June 6, 2021, reminding his command staff to "shut, secure or lock all doors … if a door cannot be secured, send notification and get it fixed immediately!"  (*Id.* at 3.)

These emails plausibly establish that Sheriff Boehrer and Major Criss were on notice that inmates were capable of "popping" their cell-door locks and roaming free—an obvious security issue.  Sheriff Boehrer and Major Criss hardly grapple with these exhibits or otherwise argue they did not know about the dangerous conditions at the jail, particularly the ability of inmates to pop doors and roam free.  Instead, they contend they were not deliberately indifferent because they knew nothing about Plaintiff specifically.  (Dkt. 198-1 at 9; Dkt. 215 at 6–7.) Sheriff Boehrer and Major Criss maintain they could not have known Plaintiff faced any danger because he was booked into the jail between 9:00 p.m. and 10:00 p.m. and attacked around 10:30 p.m., leaving too

little time for them to become aware of any risk he faced.  (*Id.*)  The Eleventh Circuit foreclosed a similar line of reasoning in *Hale*.  50 F.3d at 1583.  In that case, a defendant sheriff argued that, despite evidence he knew about generally dangerous conditions at a prison, he was not deliberately indifferent because he did not know the specific plaintiff feared an attack from specific inmates.  *Id.*  The Eleventh Circuit explained a jailer "may not escape liability merely by showing that he [or she] did not know the claimant was likely to be assaulted" or that "a specific inmate would commit an assault."  *Id.*  Rather, a plaintiff can establish the subjective element of an Eighth Amendment claim by showing the jailer "had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence" and took no reasonable steps to abate the risk.  *Id.*  (internal citations omitted).

Considering the allegations in the light most favorable to Plaintiff—and in the absence of any real engagement by Sheriff Boehrer and Major Criss—the Court concludes the emails attached to the complaint and Plaintiff's other allegations reasonably infer that both Defendants knew cell doors were highly susceptible to tampering, inmates frequently "popped out" of their cells to roam the housing units,

the defective locks gave rise to inmate violence, prison officials did not feel safe operating within the facility, and all of this created "an excessive [and intolerable] risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

Plaintiff claims he has plausibly alleged Sheriff Boehrer and Major Criss failed to respond reasonably to this substantial risk. He points to his complaint allegations that Sheriff Boehrer and Major Criss, despite knowing about the dangerous conditions failed to increase staffing, create a formal security plan, implement new training, institute policies to combat the possession and making of shanks, or request funding to fix cell-door locks and hinges. (Dkt. 176 ¶¶ 399–405.) Again, Sheriff Boehrer and Major Criss neither dispute these allegations nor seriously argue they responded to the dangerous conditions of confinement in a reasonable manner. (Dkt. 198-1 at 9.) They pay only lip service to this element of Plaintiff's claim, arguing—in a single conclusory sentence— that Plaintiff "fails to show that they responded in an objectively unreasonable manner, as required." (Dkt. 198-1 at 13.) Taking Plaintiff's allegations as true—and noting Sheriff Boehrer and Major Criss cursory

response—the Court finds Plaintiff plausibly alleged these Defendants failed to address reasonably the dangerous conditions.

Finally, causation.  Taking his allegations as true, Plaintiff would not have been beaten but for the broken or popped locks that allowed other inmates to get out of their cells and enter his, lax supervision over inmates roaming freely throughout cell blocks, and unchecked inmate violence—all risks he claims Sheriff Boehrer and Major Criss deliberately ignored.  *See Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1029 (11th Cir. 2001) ("Conditions ... where violent prisoners are allowed free reign of a [prison] with easy access to weapons without proper supervision by guards could be found to have caused the assault.").  Once more, Sheriff Boehrer and Major Criss do not dispute Plaintiff's allegations or argument on causation, and the Court finds Plaintiff satisfies this element.

Plaintiff plausibly alleges Sheriff Boehrer and Major Criss violated his Fourteenth Amendment rights through their deliberate indifference to dangerous conditions of confinement at the jail.

## B.   Clearly Established Right

To establish a violation of clearly established law, a plaintiff must show preexisting law was so clear that, under the facts at issue "every reasonable official" would have understood that what he or she was doing violated the Constitutional right at issue. *Gates v. Khokhar*, 884 F.3d 1290, 1302 (11th Cir. 2018). "[T]he clearly established law must be particularized to the facts of the case" and not "defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017). A plaintiff can meet this burden by "(1) citing case law with indistinguishable facts that clearly establishes the constitutional right; (2) pointing to a broad statement of principle within the Constitution, statute, or case law that clearly establishes the constitutional right; or (3) alleging conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1300 (11th Cir. 2023).

When a plaintiff relies on case law to demonstrate a clearly established right, "the critical inquiry is whether the law provided the [defendant official] with fair warning that [his or her] conduct violated" a constitutional right. *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir.

2011).  "Fair warning is most commonly provided by materially similar [binding] precedent from the Supreme Court, [the Eleventh Circuit], or the highest state court in which the case arose."  *Gates*, 884 F.3d at 1296. The materially similar standard is met when the specific circumstances facing the defendant officials are "enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the [defendant] official *might* make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent."  *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015). "Exact factual identity with a previously decided case is not required," *Coffin*, 642 F.3d at 1013, but "[m]inor variations between cases may prove critical," *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).

Plaintiff relies on *Marsh v. Butler County, Ala.* and *Hale v. Tallapoosa County* to show Sheriff Boehrer and Major Criss violated clearly established law by subjecting him to the conditions at the jail. *Hale* came first.  In that case, a pretrial detainee sued a sheriff and a jailer for violating his Eighth Amendment rights after he was attacked by another detainee.    50 F.3d at 1580.  He presented evidence that

"[o]vercrowding had existed at the jail for about two years at the time of [the plaintiff's] detention," "inmate-on-inmate violence was occurring on a regular basis during [the month the plaintiff was detained] and other periods of overcrowding," and plaintiff shared a cell "with assorted other detainees and inmates, who were not segregated based on their proclivity for violence or the reasons for their confinement." *Hale*, 50 F.3d at 1581–83. He also presented evidence the sheriff and jailer were aware of this "generalized, substantial risk of serious harm," took no reasonable steps to abate the condition, and the condition caused the plaintiff's injury. *Id.* at 1584-85. The Eleventh Circuit found that evidence sufficient to avoid summary judgment on plaintiff's deliberate indifference claim. *Id.*

Then came *Marsh*. In that case, two inmates claimed the sheriff's deliberate indifference to unreasonably dangerous conditions at the jail allowed other inmates to assault them, thus violating their Eighth Amendment rights. 268 F.3d at 1023. To establish the dangerous conditions, the plaintiffs presented evidence nearly identical to the evidence at issue here. Specifically, the *Marsh* plaintiffs showed "the locks on the cell doors were not functional, allowing inmates to roam freely at all hours of the day;" "homemade weapons were readily available

by fashioning weapons from material torn from the dilapidated structure of the jail;" "the jail was routinely understaffed;" and "there was no segregation of nonviolent inmates from violent inmates, [or] pretrial detainees from convicted criminals." *Id.* at 1029. The *Marsh* court concluded those allegations "presented an objectively substantial risk of harm." *Id.* at 1029. The plaintiffs also presented evidence the sheriff was "aware of the risks," that she "did nothing to alleviate the conditions" at the jail, and that the dangerous conditions caused the plaintiffs' injuries. *Id.* Turning to qualified immunity, the Eleventh Circuit—citing *Hale* and other cases—determined the sheriff violated clearly established law. *Id.* at 1034. The Court of Appeals explained "it was clearly established in this Circuit [at the time of the case] that it is an unreasonable response for an official to do nothing when confronted with prison conditions—like the conditions alleged in this case—that pose a risk of serious physical harm to inmates." *Id.* Denying qualified immunity, the Court of Appeals explained "plaintiffs adequately allege facts which (if true) show that, at the time of the incident, the sheriff's acts were not even arguably reasonable in the light of the clearly established law." *Id.* at 1034.

In the light of these cases, the Court finds Plaintiff alleges Sheriff Boehrer and Major Criss violated clearly established law in failing to take reasonable steps to abate the substantial and dangerous jail conditions that they knew about. Plaintiff—like the plaintiff in *Marsh*—alleges, among other dangerous conditions, that cell-door locks were nonfunctional, inmates roamed freely in Unit 7, lax conditions allowed prisoners easily to obtain and use weapons, the jail was overcrowded and understaffed, and nonviolent inmates were not reliably separated from violent ones. (Dkt. 176 ¶¶ 387–415.) He further alleges Sheriff Boehrer and Major Criss knew of these conditions and failed to act on that knowledge. (*Id.*) The alleged conditions and response by Sheriff Boehrer and Major Criss, taken as true, are sufficiently similar to those alleged in *Marsh* and *Hale* to conclude they had "fair warning" that their conduct violated clearly established law. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Brown v. Dunn*, 760 F. Supp. 3d 1326, 1337–8 (M.D. Ala. 2024) (relying on *Hale* and *Marsh,* finding plaintiff plausibly alleged defendant violated clearly established right where he allegedly failed to remedy understaffing, faulty locks, the proliferation of makeshift weapons, and poor supervision.).

Sheriff Boehrer and Major Criss make no meaningful effort to distinguish *Hale* or *Marsh* from this case or offer any contrary precedent. They include only one sentence in response: "although Plaintiff relies heavily on *Marsh* and *Hale*, both of those cases involved far more serious circumstances than what Sheriff Boehrer and Major Criss faced at the Clayton County jail on April 19, 2022." (Dkt. 215 at 11.) They don't explain that, and the Court can't do the work for them. But, factual identity is not required, what matters is "fair warning." *Hope*, 536 U.S. at 741. The similarities between *Hale* and *Marsh* and this case— particularly with regards to the broken locks, free-roaming inmates, and prevalence of inmate violence—are strong enough to place any reasonable officer on warning that his or her failure to take reasonable steps to abate the dangerous conditions at the jail violated the inmates' rights. And Sheriff Boehrer's and Major Criss's single-sentence response neither undermines the substantial similarities Plaintiff identifies nor helps the Court understand how a "reasonable, similarly situated official could believe that the factual differences between [*Hale* and *Marsh*] and the circumstances [at issue here] might make a difference to the conclusion about whether" Defendants' conduct was unlawful. *Merricks*,

785 F.3d at 559. So Plaintiff has carried his burden of showing Sheriff Boehrer and Major Criss violated clearly established law.

The Court determines Sheriff Boehrer and Major Criss are not entitled to qualified immunity on Count 2 at this time and denies their motion to dismiss that count.

## V.   Officer Williams's Motion to Dismiss

As explained, Officer Williams was the only corrections officer in the observation tower on Unit 7 when the other inmates attacked Plaintiff. (*Id.* ¶¶ 191–92.) In Count 11, Plaintiff alleges Officer Williams violated his constitutional rights by failing to intervene in his beating. In Counts 12 and 13, he brings state law claims against Officer Williams for failing to intervene and for failing to properly monitor the other inmates. Officer Williams moves to dismiss.

### A.   Count 11: Failure to Intervene Against Officer Williams Under 42 U.S.C. § 1983

Officer Williams argues he is entitled to qualified immunity on Plaintiff's federal failure-to-intervene claim in count 11. (Dkt. 198-1 at 2.) He says he was acting within the scope of his discretionary authority when he allegedly failed to intervene in Plaintiff's assault while on duty in the observation tower. (Dkt. 198-1 at 5–6.) To determine whether he

was acting within the scope of his discretionary authority, the Court must "assess whether [the acts in question] are of a type that fell within [his] job responsibilities." *Hollomon ex rel. Hollomon v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Since Plaintiff alleges Officer Williams was assigned to monitor the inmates in Unit 7 when he allegedly violated Plaintiff's constitutional rights, the Court concludes he was acting within the purview of his job responsibilities when he allegedly watched, or failed to watch, or failed to intervene. *See Howard v. Gee*, 538 F. App'x 884, 887 (11th Cir. 2013) (correctional officer was acting within his discretionary authority while supervising inmates and maintaining security).[6] This shifts the burden to Plaintiff to show qualified immunity does not apply.

Plaintiff fails to carry his burden. Although he contends he plausibly alleged Officer Williams violated his constitutional rights, Plaintiff makes no argument or allegation that those rights were "clearly

---

[6] The Court recognizes *Howard* is unpublished and not binding. The Court cites it and other unpublished decisions nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

established." (*See* Dkt. 209 at 20–21.) He doesn't even address Officer Williams's claim that he is entitled to qualified immunity.[7] Plaintiff cannot overcome Officer Williams's qualified immunity and count 11 is dismissed.[8]

---

[7] It's possible Plaintiff failed to address Officer Williams's assertion of qualified immunity because Officer Williams only gives cursory attention to it. The Court, however, finds he did enough to make the threshold showing that he was engaged in a discretionary function and thus shift the burden to Plaintiff. Defendants' motion to dismiss twice says *all* the moving Defendants are entitled to qualified immunity—necessarily including Officer Williams. (Dkt. 198-1 at 2, 5.) And the Motion also states "these Defendants" acted within the scope of their discretionary authority, including Officer Williams, and provides authority for that claim. That was enough to put Plaintiff on notice Officer Williams was claiming qualified immunity and that he needed to address the issue.

[8] Because the Court finds Plaintiff did not carry his burden of demonstrating a "clearly established" right, it need not address whether he alleged a constitutional violation by Officer Williams. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

**B.    Count 12 and 13: State Law Claims Against Officer Williams**

Counts 12 and 13 assert state law claims against Officer Williams. (Dkt. 176 ¶¶ 480–94.)   Under Georgia's doctrine of official immunity, state officers "are subject to suit only when they negligently perform or fail to perform their ministerial functions or when they act with actual malice or intent to cause injury in the performance of their [discretionary] functions." *Peterson v. Baker*, 504 F.3d 1331, 1339 (11th Cir. 2007); *see Bailey v. Wheeler*, 843 F.3d 473, 485–86 (11th Cir. 2016).  Plaintiff never alleges Officer Williams acted with "actual malice or intent to cause injury."  Instead, he seeks to avoid official immunity on Counts 12 and 13 by alleging Officer Williams negligently failed to perform ministerial duties and that his negligence caused Plaintiff's injuries.  Specifically, in Count 12, he alleges Officer Williams saw inmates entering his cell, saw them beating him, and failed to stop the attack or end it sooner.  (Dkt. 176 ¶¶ 481-89.)  He claims Officer Williams thus violated a ministerial duty under Georgia law "to stop the unauthorized movement into and out" his cell by other inmates and "to stop the attack" on him.  (*Id.* ¶ 487.)  In Count 13, he alleges Officer Williams failed adequately to monitor inmates on Unit 7, did not see the inmates enter his cell, and thus did

not intervene to stop the attack.  (*Id.* ¶ 493-94.)  He says Officer Williams thus violated a ministerial duty under Georgia law to monitor visually the movement of inmates by available cameras and observation windows. (*Id.* ¶ 492.)  Officer Williams moves to dismiss, arguing he was exercising discretion in monitoring the housing unit and (in the absence of malice) is entitled to official immunity.  (Dkt. 198-1 at 24.)

A ministerial function is "simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Murphy v. Bajjani,* 647 S.E.2d 54, 57 (Ga. 2007).  A discretionary function on the other hand requires "the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed."  *Id.*  For detention officers, "the acts of following *established policies* of inspecting and monitoring detainees are ministerial tasks."  *Brantley v. Jones*, 871 S.E.2d 87, 96 (Ga. Ct. App. 2022) (emphasis added).  "The determination of whether the acts or omissions of [Williams] were ministerial or discretionary is a legal question for the court." *Kelly v. Lewis*, 471 S.E.2d 583, 586 (Ga. Ct. App. 1996)

Officer Williams fails to address Plaintiff's claim in Count 12 that he violated a "ministerial duty under Georgia decisional law" to stop the "unauthorized movement . . . and to stop the attack." (Dkt. 176 ¶ 487.) While he argues Plaintiff has not alleged malice, he does not argue he performed a discretionary function in this regard. (Dkt. 198-1 at 23.) But, under Georgia law, he must show "that the specific acts he performed were discretionary" to obtain immunity. *Howell v. Willis*, 729 S.E.2d 643, 647 (Ga. Ct. App. 2012). Officer Williams's only arguments regarding a discretionary function appear in the context of Count 13, not Count 12. He makes no other arguments regarding Count 12 (other than a reference to a nonexistent section of his motion). He thus has not carried his burden of showing official immunity applies as to Count 12.

For Count 13, Plaintiff relies on the Sheriff's Standard Operating Procedure (SOP) 4.06(3) which states that "Central Control shall visually monitor the inmate(s) movement through the facility by available camera monitors and observation windows." (Dkt. 209 at n. 14; Dkt. 176-24.) Plaintiff says this is an "established policy," rendering Officer Williams's supervision of inmates a ministerial function. (Dkt. 176 ¶ 491.) Although not stated clearly, Plaintiff seems to suggest Officer Williams would have

been carrying out SOP 4.06 on the night in question and that policy created a ministerial duty because it was "simple, absolute, and definite … requiring merely the execution of a specific duty." *Murphy*, 647 S.E.2d at 57.

There are two problems with Plaintiff's argument. First, Plaintiff has not plausibly alleged the SOP applied to Officer Williams on the night in question. The provision upon which Plaintiff relies directs the conduct of "Central Control," but Plaintiff alleges Officer Williams was stationed in the "Control Tower" for Unit 7, never alleging this was part of Central Control. (Dkt. 176 ¶ 191.) The Court does not know—and Plaintiff does not explain—whether his location was part of Central Control.[9] Building

---

[9] Plaintiff contends the issue of whether SOP 4.06 applied to officers (like Williams) in the Unit 7 control tower and not just to officers in the Central Control tower is a question of fact. (Dkt. 209 at 21.) While the Court takes the facts Plaintiff alleges *plausibly* as true, he has not done so with regards to this one. Plaintiff argues SOP 4.06 requires "Central Control to monitor inmate movement through camera monitors and observations windows," and because "the inmates in Unit 7 can only be observed through the 'observation windows,'" this is somehow "evidence that the term "Central Control in SOP 4.06 refers to all the control towers." (*Id.*) This conclusion does not follow. In fact, his reasoning cuts against his conclusion; if the inmates in Unit 7 can only be observed through observation windows, that would suggest a policy requiring supervision via "camera monitors" would not apply to that tower. This assertion also directly contradicts Plaintiff's allegation that Williams

on that, SOP 4.06—attached to Plaintiff's complaint and thus subject to consideration at this stage—seems to address the intended movement of inmates throughout the facility, not a process for monitoring inmates when they are supposed to be locked in their cells (as happened here). It starts with a policy that the jail "shall ensure inmate movement through the facility is accomplished with a minimum disruption to the daily operations" and that "[d]uring inmate movement the staff shall also strive to maintain a safe environment for all employees and inmates." (Dkt. 176-24.) It then sets "Procedures" for accomplishing that, including officers telling "Central Control" when they are moving inmates outside a housing unit, requiring inmates who are being moved "to walk in a single file line with their hands behind their back[s] without speaking and on the right side of the hallway," and requiring officers to "escort inmates known to be extremely violent or considered an escape risk" whenever those inmates leave their housing area. (*Id.*) The duty for "Central Control" to monitor inmate movement is included among these

---

could monitor security cameras from Unit 7 control tower. (Dkt. 176 ¶ 206.) All of this shows he has not plausibly alleged Officer Williams observation tower was part of "Central Control."

other procedures—suggesting this is a process for the orderly, safe, and intentional movement of inmates throughout the jail. This suggests Central Control is not the same as an observation tower in one housing unit and the procedure was not applicable to Officer Williams's conduct when he was supposed to be monitoring the unit on the night in question while the inmates were supposed to be in their cells.

Second, even if it applied to Officer Williams, SOP 4.06 is not "a written policy … [that is] so clear, definite and certain as merely to require the execution of a relatively simple, specific duty" at least not in regards to Officer Williams's conduct on that night. *Roper v. Greenway*, 751 S.E.2d 351, 353 (Ga. 2013). The procedure does not explain how often the officers in "Central Control" must visually monitor inmates, the manner in which they must do so, or which inmate movements must be monitored. It simply does not explain how an officer is supposed to monitor against inmates popping their doors and leaving their cells without authorization. These omissions leave ample room for "the exercise of personal deliberation and judgment" that are inconsistent with ministerial duties. *See Murphy*, 647 S.E.2d at 57. Comparable jail operating procedures that Georgia courts have found to create

ministerial duties typically prescribe specific inmate-monitoring schedules and leave much less room for interpretation. *See, e.g., Lundy v. Hancock Cnty*., 890 S.E.2d 92, 99 (Ga. Ct. App. 2023) (prescribing highly detailed suicide prevention procedures including requirement that officers observe inmates designated "Close Observation . . . at staggered intervals not to exceed every 15 minutes" and those designated "Constant Observation . . . on a continuous, uninterrupted basis."); *Brantley v. Jones*, 871 S.E.2d 87, 92 (Ga. Ct. App. 2022) (inmate monitoring regimen that mandates "in-person surveillance of at least every 15 minutes" for certain inmates); *Clark v. Prison Health Servs., Inc.*, 572 S.E.2d 342, 348 (Ga. Ct. App. 2002) (policy required prison guards to "inspect[] the cells in the unit according to the prescribed schedule and document[] detainees' location and status.").

The Court concludes both that Plaintiff has failed to allege plausibly the procedure at issue in Count 13 applied to Officer Williams's conduct on the night in question and that SOP 4.06 is too general to create a "simple, absolute, and definite" duty. *See Murphy*, 647 S.E.2d at 57. Accordingly, Officer Williams was performing a discretionary

function while monitoring the housing unit and is entitled immunity under Georgia law as to Count 13.

## VI.  Sheriff Allen's Motion to Dismiss

Plaintiff brings three claims against Sheriff Allen in his official capacity.[10]    In Count 1, he alleges Sheriff Allen was deliberately indifferent to the substantial risk of serious harm to inmates because he knew about problems with the "compromised locks" but failed to tell the County Commissioners about the problems or otherwise address them. (Dkt. 176 ¶¶ 377–386.)    In Count 2, he alleges Sheriff Allen was deliberately indifferent to all the dangerous conditions of confinement at the jail, including (among other things) the broken locks and hinges, increased inmate violence and weapon possession, an inmate extortion ring, understaffing, poor training, and overcrowding.  (*Id.* ¶¶ 387–415.) Finally, in Count 15, he alleges Sheriff Allen was deliberately indifferent to inmates' medical needs by contracting with a medical provider known

---

[10] Though Plaintiff refers to the "Sheriff's Office" in these counts and not Sheriff Allen, he clarifies he is suing the latter.  (Dkt. 210 at 14.)  He used this term because Sheriff Allen was not Sheriff at the time of Plaintiff's assault.  The Court will call him "Sheriff Allen"—because that is who moves to dismiss—but notes the relevant conduct is that of the Sheriff's Office prior to Allen's arrival.

to deliver inadequate care. (*Id.* ¶¶ 503–14.) Sheriff Allen contends he is entitled to Eleventh Amendment immunity on all three claims. (Dkt. 197-1 at 8–20.)

"Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an 'arm of the State' is sued." *Manders v. Lee,* 338 F.3d 1304, 1308 (11th Cir. 2003). "To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State." *Id.* Sheriff Allen was acting as "an arm of the state" when he allegedly engaged in the conduct at issue in counts 1, 2, and 15.

As relevant to counts 1 and 2, a Georgia county sheriff functions as an arm of the State—not of the county—"when promulgating policies and procedures governing conditions of confinement" at a county jail. *Purcell ex rel. Est. of Morgan v. Toombs Cty., Ga.*, 400 F.3d 1313, 1325 (11th Cir. 2005); *see also Andrews v. Biggers*, 996 F.3d 1235 (11th Cir. 2021) (relying on *Purcell*, finding sheriff immune in challenge to policy of "cross-gender supervision of inmates" at county jail); *Holloway v. Pritchett*, 2024 WL 5701788 (N.D. Ga. August 8, 2024) (relying on *Purcell*, finding sheriff

immune to conditions of confinement and medical deliberate indifference claims where inmate complained of "brutal attacks by other inmates"); *Boyd v. Nichols*, 616 F. Supp. 2d 1331, 1343 (M.D. Ga. 2009) (sheriff immune where plaintiff challenged policies of inadequate training and understaffing at county jail). The allegations in counts 1 and 2 flow directly from Sheriff Allen's administration of the jail—particularly his alleged "implement[ation] [of] a custom of deliberate indifference to jail maintenance." (Dkt. 210 at 21.) This fits the bill of a "polic[y] or procedure[] governing conditions of confinement" at the jail. *See Purcell*, 400 F.3d at 1325.

A Georgia sheriff also acts as an "arm of the state and is entitled to Eleventh Amendment immunity with respect to the particular function of providing medical care" to pretrial detainees. *Myrick*, 69 F.4th at 1296; *see also McDaniel v. S. Corr. Med. LLC*, 2024 WL 4471063, at *4 (11th Cir. Oct. 11, 2024) (reaffirming *Myrick*). So Sheriff Allen's decision to select a medical provider he believed could deliver cost-effective care— the decision Plaintiff attacks in Count 15—is precisely the sort of conduct for which he "wears a state hat." 69 F.4th at 1296; *see also England v. Clayton Cnty., Georgia*, 2025 WL 4058244 (N.D. Ga. Sept. 18, 2025)

(relying on *Myrick,* finding Eleventh Amendment immunity, and dismissing deliberate indifference to medical need claim where plaintiff alleged substandard care by CorrectHealth).

Plaintiff does really dispute Sheriff Allen's argument that *Purcell* and *Myrick* support a finding of Eleventh Amendment Immunity on Counts 1, 2, and 15. He instead insists *Purcell* misread the Eleventh Circuit's en banc opinion in *Manders* when it concluded "a sheriff acts as an arm of the State when promulgating policies and procedures that govern the conditions of confinement at a county jail." (Dkt. 210 at 14–19.) He insists *Manders* was not that expansive and *Purcell* should be overruled. In support of this argument, he points to concurring opinions in *Andrews v. Biggers*—one asserting *Purcell* was "incorrectly decided" and the other calling for the Eleventh Circuit to "reevaluate" its application of Eleventh Amendment immunity and "in particular [its] decision in *Purcell." Andrews,* 996 F.3d at 1236–43 (Wilson, J., and Rosenbaum, J., separately concurring). But the Eleventh Circuit panel in *Andrews* recognized the continued viability of those decisions. *See id.* at 1236 ("[Plaintff] wants *Purcell* overruled and our Court to revisit the factors discussed in *Manders* … Of course, we as a panel cannot overrule

*Manders* or *Purcell*").  Certainly this Court cannot overrule Eleventh Circuit precedent.  *See McDaniel*, 2024 WL 4471063, at *4 ("Indeed, [plaintiff] devotes almost the entirety of his reply brief to arguing that *Myrick* was wrongly decided. Of course, only a decision by this court sitting en banc or by the United States Supreme Court can overrule a prior panel decision.").

Finally, in a last-gasp effort to avoid dismissal of counts 1, 2, and 15, Plaintiff argues "§ 1983 clearly abrogated Eleventh Amendment immunity."  (Dkt. 210 at 16.)  He is incorrect.  The Supreme Court has long held that "§ 1983 does not ... abrogate the Eleventh Amendment immunity of the States."  *Quern v. Jordan*, 440 U.S. 332, 345 (1979); *see also Carr v. City of Florence, Alabama,* 916 F.2d 1521, 1525 (11th Cir. 1990) ("Congress has not abrogated Eleventh Amendment immunity in section 1983 cases.").

Because Sheriff Allen is entitled to Eleventh Amendment immunity as to Counts 1, 2, and 15, the Court dismisses those claims against him without prejudice.[11]

---

[11] The parties dispute whether the Court should dismiss these claims with or without prejudice.  (Dkt. 210 at 17; Dkt. 214 at 6.)  The law

## VII. Clayton County's Motion to Dismiss

"The Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). A county's liability under § 1983 may not be based on the doctrine of respondeat superior. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978). Indeed, a county is liable only when the county's "official policy" causes a constitutional violation. *Id.* A plaintiff can establish an official policy of a county by identifying (1) an officially decreed policy, (2) an unofficial custom or practice that is so well settled and widespread that it constitutes a custom with the force of law, or (3) a county official with final policymaking authority who made a decision that violated the plaintiff's constitutional rights. *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).

Plaintiff seeks to hold Clayton County liable—via the "final policymaker" avenue—for the Sheriff Office's alleged custom of deliberate indifference to prison maintenance (Count 1) and for CorrectHealth's

---

requires dismissal without prejudice. *See Dupree v. Owens,* 92 F.4th 999, 1008 (11th Cir. 2024) ("Because the dismissals were based on sovereign immunity grounds, the jurisdictional nature of the dismissal requires it to be entered without prejudice.").

alleged custom of deliberate indifference to inmate health (Count 15). (Dkt. 176 ¶¶ 344–86, 502–14.)  Clayton County contends it cannot be held liable for either.  The Court agrees.

### A.    Count 1: Failure to Maintain Prison

A key concept in municipal liability is that "local governments [such as counties] can never be liable under § 1983 for the acts of those [officials] whom the local government has no authority to control." *Grech*, 335 F.3d at 1331.  That's a problem for Plaintiff because Clayton County did not have "direct control" over the Sheriff's Office's actions in administering or maintaining the jail.  *See id.* ("The inquiry [] ask[s] which government body, under state law had direct control over how the sheriff fulfilled the duty at issue.")  As discussed above, the Sheriff acted as an "arm of the state"—not of Clayton County—when he allegedly "implement[ed] a custom of deliberate indifference to jail maintenance." (Dkt. 210 at 21.)  The Sheriff's "authority and duty to administer the jail in his jurisdiction flows from the State, not [Clayton] County." *Manders*, 338 F.3d at 1315.  This makes sense—"Georgia's Constitution [] makes the sheriff's office a constitutional office independent from the county entity itself, precludes all county control, and grants only the State

control over sheriffs." *Id.* at 1312. Because Clayton County does not exercise control over the Sheriff—much less "direct control"—in "promulgating policies and procedures governing conditions of confinement" at the jail, he is not a "policymaker" for whom Clayton County can be liable on the facts alleged in Count 1. *See Purcell*, 400 F.3d at 1325; *see also Nimmons v. Gwinnett Cnty., Ga.*, 2014 WL 4230914, at *3 (N.D. Ga. Aug. 25, 2014) ("To the extent that Plaintiff seeks to attribute … [sheriff's] actions (or inaction), to Gwinnett County, Plaintiff cannot state a claim against the County under Section 1983 because the County does not exercise control over the Sheriff's personnel decisions, or the policies and procedures established by the Sheriff that governed the conditions of Plaintiff's confinement."); *Youngs v. Johnson*, 2008 WL 4816731, at *9 (M.D. Ga. Oct. 30, 2008) (finding county not liable under *Monell* for prison policies of sheriff because, under *Purcell*, sheriff was acting on behalf of the state); *Robinson v. Houston Cnty.*, 2010 WL 2464901, at *8 (M.D. Ga. June 14, 2010) (same).

Though the parties largely focus on whether various Georgia statutes impose a non-delegable duty on Clayton County to maintain the jail, the Court need not delve into those arguments. They address the

wrong question for *Monell* purposes. To determine whether the Sheriff's Office was a "policymaker" acting on behalf of the County, the question is not whether Georgia law statutorily confers some—or even most—responsibility on Clayton County to maintain the jail. Rather, the question is whether, under Georgia law, Clayton County exercised "direct control" over the Sheriff when he engaged in the alleged conduct at issue. *See Grech*, 335 F.3d at 1331–32. ("Thus, the appropriate § 1983 inquiry under federal law is whether defendant Clayton County, under Georgia law, has control over the Sheriff in his law enforcement function."). As discussed, the County did not.

The Court dismisses Count 1 as to Clayton County.

## B.    Count 15: Inadequate Medical Care

In Count 15, Plaintiff alleges Clayton County, through CorrectHealth as a final policymaker, "implemented a custom of deliberate indifference to inmate health." (Dkt. 205 at 20; Dkt. 176 ¶¶ 502–14.) Clayton County raises two arguments for dismissal of this count. First, it argues it satisfied its statutory duty under O.C.G.A. § 42-5-2 to "maintain the inmate" by simply funding medical care at the jail and that only the Sheriff can be liable for the policies of CorrectHealth

because, under Georgia law, the Sheriff has exclusive authority to select medical contractors for the county jail.  (Dkt. 213 at 10–15 (citing *Bd. of Comm'rs of Spalding Cty. v. Stewart*, 668 S.E.2d 644, 645 (Ga. 2008).)  Second, the County argues Plaintiff's isolated incident, standing alone, is insufficient to establish CorrectHealth maintains a custom of deliberate indifference to inmate health.  (Dkt 187-1 at 17.)  Because the Court agrees with Clayton County's second contention, it does not address the first.

Plaintiff fails to allege plausibly that CorrectHealth (even if a final policymaker) had a custom of deliberate indifference to inmate health. Plaintiff argues the Court can discern CorrectHealth's custom from just two instances—his own plight in April 2022 and that of another inmate who allegedly received inadequate medical care from CorrectHealth in January 2023.  (Dkt. 205 at 20.)  As an initial matter, the Court cannot consider the January 2023 incident because that information appears neither within the four corners of the Second Amended Complaint nor as

an exhibit attached to it.[12] *Turner v. Williams*, 65 F.4th 564, 584 n. 27 (11th Cir. 2023) ("In general, courts only consider the four corners of a complaint and the complaint's attached exhibits when analyzing a Rule 12(b)(6) motion to dismiss.").  And even if the Court did consider it, CorrectHealth's subsequent conduct, postdating Plaintiff's incident by nine months, cannot plausibly suggest a custom of deliberate indifference existed at the time Plaintiff was treated by CorrectHealth.  *See Connick v. Thompson*, 563 U.S. 51, 63 n. 7 (2011) ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the cit[y] and the opportunity to conform to constitutional dictates ....").

That leaves just Plaintiff's isolated incident as the basis for finding CorrectHealth maintained a custom of deliberate indifference to inmate health.  But the Eleventh Circuit has held that "[a] single incident of a constitutional violation is insufficient to prove a policy or custom." *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1311 (11th Cir. 2011); *see Grech*, 335

---

[12] Though the January 2023 incident is referenced in an exhibit attached to Plaintiff's original Complaint (Dkt. 1-2), he removed that exhibit when he amended it.  So, it is not properly before the Court.

F.3d at 1330 n.6 ("A single incident would not be so pervasive as to be a custom."). In *Craig*, the plaintiff—like Plaintiff here—sought to hold a Georgia county liable for a private contractor's alleged "custom of deliberate indifference to the serious medical needs of pretrial detainees" in a county jail. *Id.* at 1308. The plaintiff's "proof of a policy or custom rest[ed] entirely on a single incident of alleged unconstitutional activity"—his own medical care while incarcerated. *Id.* at 1312. The Eleventh Circuit held that was not enough to establish the private contractor had a policy for which the county could be liable under *Monell*.[13] This Court follows suit.[14]

---

[13] The Eleventh Circuit also rejected the plaintiff's argument that "[the contractor] had a policy or custom of using the least costly means of treating patients and that this custom deprived him of his constitutional right." *Craig*, 643 F.3d at 1312. Plaintiff makes more or less the same allegation in Count 15. (Dkt. 176 ¶ 551.) The Eleventh Circuit expressed doubt that such a policy—similar to CorrectHealth's alleged "cost containment policy"—was constitutionally violative: "[E]ven on the highly questionable assumption that the alleged policy or custom would amount to a constitutional violation, Craig again relies on his experience alone to prove a policy or custom." *Craig*, 643 F.3d at 1312.

[14] The Court recognizes "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997). But Plaintiff does not travel under this theory, instead insisting it was CorrectHealth's policy or custom of "cost containment"—not a one-off

Plaintiff fails to allege CorrectHealth had a custom or practice of deliberate indifference to inmates' medical needs. *See id.* Accordingly, the Court dismisses Count 15 as to Clayton County.

## VIII. Punitive Damages and Attorneys' Fees

In addition to the underlying claims against them, Defendants move to dismiss Plaintiff's claims for punitive damages and attorneys'

---

decision—that led to the violation of his constitutional rights. (Dkt. 176 ¶¶ 508–13; Dkt. 205 at 16 ("[Riley] has plausibly pleaded facts showing that CorrectHealth had a custom that constituted deliberate indifference to his constitutional rights. Since this custom of CorrectHealth may fairly be said to represent official policy of the County, it is also *the County's* custom of deliberate indifference.")

And even if Plaintiff did go the "single decision" route, he does not allege facts that would support it. A county can only be liable for the decisions of a final policymaker when that official's decisions are not subject to "meaningful administrative review." *See Chabad-Chayil*, 48 F.4th at 1230. Further, whether an official has final policymaking authority is determined by state law and, where the "party at issue [] is a corporation contracting with the state, the relevant 'state law' for policymaking determinations are the contracts between [the corporation], the state, and [the corporation's] employees." *Howell v. Evans*, 922 F.2d 712, 724 (11th Cir. 1991). Neither Plaintiff's complaint nor opposition brief address whether the challenged decisions of CorrectHealth were subject to "meaningful administrative review" or whether CorrectHealth's contract with the Sheriff's Office gave it final policymaking authority on behalf of Clayton County. Thus, even if Plaintiff did allege Clayton County was liable for a single decision of CorrectHealth as its final policymaker, his claim in Count 15 would still fall short.

fees. (Dkt. 187-1 at 14; Dkt. 197-1 at 20; Dkt. 198-1 at 24.) Because the Court dismisses Plaintiff's underlying claims against Sheriff Allen and Clayton County, his claims for punitive damages and attorneys' fees against those Defendants are dismissed as well. *See Popham v. Landmark Am. Ins. Co.*, 798 S.E.2d 257, 264 (Ga. Ct. App. 2017) ("[A]wards of punitive damages and attorney fees are derivative of underlying claims, where those claims fail, claims for punitive damages and attorney fees also fail."). However, because Plaintiff's § 1983 claims will proceed against Sheriff Boehrer, Major Criss, and Officer Williams, his claims for punitive damages and attorneys' fees remain viable against them.

## IX.    Motion to Add Parties

The final matter the Court must address is Plaintiff's Motion to Add Defendants (Dkt. 196). He seeks to amend his complaint—for a third time—to add six jail officials as defendants and an additional seven counts. (*Id.* at 5–6.) Defendants argue against the addition of these parties and claims on the grounds they are time-barred. The Court, however, believes Plaintiff may be able to proceed under Georgia's crime-victim exception, which tolls the statute of limitations for claims "that

46

may be brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of such alleged crime … until the prosecution of such crime … has become final or otherwise terminated, provided that such time does not exceed six years." O.C.G.A. § 9-3-99.[15]

Nevertheless, the Court has concerns with how Plaintiff wishes to proceed with this case. Although he may generally prosecute the case as he sees fit, the Court fears Plaintiff is simply trying to throw the "kitchen sink" at Defendants in a manner that will burden both the parties and the Court and unnecessarily delay the resolution of this matter. Importantly, many of the proposed claims are subsumed by or duplicative of the claims against Interim Sheriff Boehrer and Major Criss in Count 2. Because the Court finds those claims survive dismissal, it offers Plaintiff the opportunity to re-evaluate whether he believes it necessary to bring all—or even some—of the claims against the prospective defendants. To that end, the Court **STAYS** Plaintiff's Motion to Add

---

[15] Even if the statute of limitations does not bar the new claims, the requirements of Rule 15 might. The Court reserves judgment on that question pending the hearing discussed below.

Parties (Dkt. 196) pending a hearing on the matter. At that hearing, the parties will discuss the most efficient and just path forward. The Court **SETS** the hearing for **March 31, 2026, at 2:00 p.m.**, in Courtroom 1906, Richard B. Russell Federal Building, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303.

## X. Conclusion

Here's where things stand. The Court **DENIES** Plaintiff's Motion for Judicial Notice (Dkt. 218). The Court **GRANTS** Clayton County's Motion to Dismiss (Dkt. 187) and Clayton County is **DISMISSED** from this action. The Court also **GRANTS** Sheriff Allen's Motion to Dismiss (Dkt. 197) and Sheriff Allen is **DISMISSED** from this action. The Court **GRANTS IN PART** and **DENIES IN PART** Interim Sheriff Boehrer, Major Criss, and Officer Williams's Motion to Dismiss (Dkt. 198). Counts 11 and 13 against Officer Williams are dismissed, while Count 12 may proceed. Count 2 may proceed as to Interim Sheriff Boehrer and Major Criss. Plaintiff's Motion to Add Parties (Dkt. 196) is **STAYED** and **ADMINISTRATIVELY TERMINATED** pending the hearing on the matter.

**SO ORDERED** this 4th day of March, 2026.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE